IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **EDDIE JAMES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )   CIVIL NO. 10-067-GPM |
| | ) |
| **ILLINOIS DEPARTMENT OF CORRECTIONS**, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

# **MEMORANDUM AND ORDER**

**MURPHY, District Judge:**

　　Plaintiff Eddie James, an inmate in the Pinckneyville Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. This case is now before the Court for a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening.**– The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) **Grounds for Dismissal.**– On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
> 　　(1) is frivolous, malicious, or fails to state a claim on which relief
> 　　may be granted; or
> 　　(2) seeks monetary relief from a defendant who is immune from such
> 　　relief.

28 U.S.C. § 1915A.  An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Upon careful review of the

complaint and any supporting exhibits, the Court finds it appropriate to exercise its authority under § 1915A; portions of this action are subject to summary dismissal.

### THE COMPLAINT

The basis for this action is simple. In early August 2008, James injured his lower back while playing basketball. On August 9, 2008, he sought medical treatment for this injury. For 12 pages of the complaint, James provides a detailed factual account of his numerous visits with medical personnel between August 9, 2008, through December 2, 2009. James was eventually diagnosed with a herniated disk, degenerative disk disease, degenerative spondylosis of the lumbar spine, and probable compression in the area of his herniated disk. Surgery was recommended but apparently had not been performed before James filed this action in January 2010.

### LEGAL STANDARDS

James's primary legal claim is that all Defendants were deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment.

> A deliberate indifference claim requires both an objectively serious risk of harm and a subjectively culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A deliberate indifference claim premised upon inadequate medical treatment requires, to satisfy the objective element, a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. The subjective component of a deliberate indifference claim requires that the prison official knew of "a substantial risk of harm to the inmate and disregarded the risk." *Id.*; *Farmer*, 511 U.S. at 834. Mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Greeno*, 414 F.3d at 653; *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Still, a plaintiff's receipt of some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" a medical condition. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (citation omitted).

*Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007).

James also asserts that in failing to provide him with medical treatment, continuously charging him a $2.00 co-payment for medical visits, and denying his grievances, Defendants violated his Fourteenth Amendment right to due process.

With respect to the $2.00 co-payment plan, courts consistently have held that such a plan is not unconstitutional.  *See Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997) (prisoner co-payment plan does not violate the Eighth Amendment); *Shapley v. Nevada Bd. of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir. 1985) (finding nothing *per se* unconstitutional about charging an inmate $3.00 for every medical visit; such a charge, by itself, did not constitute deliberate indifference under *Estelle*); *Hudgins v. DeBruyn*, 922 F.Supp. 144, 150-52 (S.D. Ind. 1996) (prisoner co-payment plan does not violate the Eighth Amendment); *Martin v. DeBruyn*, 880 F.Supp. 610, 615 (N.D. Ind. 1995), *aff'd*, 116 F.3d 1482 (7th Cir. 1997) (Eighth Amendment guarantees only that inmates receive necessary medical care; it does not guarantee free medical care).  Thus, requiring James to pay a $2.00 co-payment for his medical visits does not violate the Constitution.

As for denial of his grievances, "a state's inmate grievance procedures do not give rise to a liberty interest protected by the due process clause." *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1995).  The Constitution requires no procedure at all, and the failure of state prison officials to follow their own procedures does not, of itself, violate the Constitution. *Maust v. Headley,* 959 F.2d 644, 648 (7th Cir. 1992); *Shango v. Jurich*, 681 F.2d 1091 (7th Cir. 1982).  James has no constitutional right to receive his desired response – or any response – to his grievances, and the failure of Defendants to provide him with his requested relief is not a constitutional violation.

Finally, as set forth above, claims regarding medical care fall under the Eighth Amendment, not the Fourteenth Amendment. Thus, the Court will address the medical care claims only with respect to the Eighth Amendment.

### ANALYSIS

Keeping in mind the standards set forth above, the Court now will examine the allegations made against each named Defendant.

*Nurse Lucas*

James states that he sought treatment for his back injury on August 9, 2008, at the nurse sick-call line. He told Lucas that he had extreme pain in his lower back, which became worse when he sat or bent over. He explained that he had been taking Tylenol but that it had not helped. James asked to see a doctor, but Lucas told him that he needed to be seen on the sick-call line three times before he would be referred to the doctor. Lucas gave him more Tylenol and an exercise sheet. This one encounter with Lucas does not support a claim that she was deliberately indifferent to James's medical needs. Because James has failed to state a claim against her, Lucas is dismissed with prejudice from this action.

*Nurse Ferrari*

On August 18, 2008, James returned to the nurse sick-call line and spoke with Ferrari. He hold her that his lower back pain was spreading down his left leg, that he could not bend forward or raise his left leg without extreme pain, and that he was having difficulty sleeping. Ferrari gave him a paper explaining how to properly sit and lift. James complained that he had been required to sign the $2.00 medical co-payment form, yet had not been referred to the doctor. He asked to see the doctor, or at least to have an x-ray; Ferrari denied both requests. James also asked her to verify

what he had been told by Lucas regarding three visits to the sick-call line, and Ferrari confirmed that policy.  As with Lucas, this one encounter with Ferrari does not support a claim that she was deliberately indifferent to James's medical needs.  James has failed to state a claim against Ferrari, so she is dismissed from this action.

### *Dr. Obadina*

On September 7, 2008, James returned to the nurse sick-call line.  He repeated his complaints of back pain to Nurse Gale (not a defendant), and she referred him to Dr. Obadina.  James saw Obadina two days later, reiterating his complaints of extreme pain in his lower back and left leg.  Obadina told him not to lift more than five pounds, and he prescribed some pain medication.  James insisted that the problem was more serious and requested an x-ray, which Obadina refused.  He told James that he merely had a stiff back from laying around doing nothing, and that James needed to do some exercises.

James next saw Obadina on December 2, 1008.  Obadina told him that he did not have time to listen to whining and complaining, that many people live with back pain, and that James would just have to deal with it.  Nurse Farris (not a defendant) noted that James did not have a history of chronic complaining about medical problems, so Obadina ordered an x-ray.  The x-ray was taken the next day, but James was never called back to review it.

On February 6, 2009, James again saw Obadina.  Obadina then told him that James suffered from scoliosis and degenerative disk disease, and that he would refer James to the physical therapist for exercises.  James protested, stating that his attempts to do the exercises on the sheet only caused him more pain, but Obadina told him that was all Obadina could do for him.

On a referral from the therapist, James saw Obadina again on April 8, 2009.  Obadina did

nothing but prescribe more pain medication, which James found to be ineffective. James asked about getting an MRI, but Obadina said that the therapist could not make recommendations to the doctor and that the therapist simply was supposed to set out an exercise plan.

James saw Obadina again on June 4, 2009. At that time, Obadina conducted an examination and determined that James's left leg was smaller than his right, and that he had lost some feeling in that leg. Obadina then ordered an MRI, which was done on June 25, 2009. On July 21, 2009, Obadina told James that he had a ruptured disk and that Obadina would schedule an appointment with a surgeon.

James saw the neurosurgeon, Robert Schultz (not a defendant), on August 29, 2009. Schultz ordered an EMG, which was done on September 21, 2009. James saw Schultz again on December 2, 2009, at which time surgery was recommended. Schultz also prescribed Vicadin to replace the pain medication currently ordered by Obadina. However, Obadina refused to order that medication for him. Obadina also denied James's requests for a lower bunk permit, an egg crate mattress, and other medical orders to accommodate his injury.

Applying the standards set forth above to these allegations, the Court is unable to dismiss James's claim against Obadina at this time.

### *P.A. Gerst*

On October 24, 2008, James had an appointment with Physician's Assistant Gerst. When Gerst came out of his office, he saw that James was standing instead of sitting. Gerst directed him to sit, so James explained that sitting caused him extreme pain and that C/O Crawford had permitted him to stand. Gerst told James that if he didn't sit, he would be the last patient seen. James continued to stand, so Gerst took appointments with the other waiting inmates. When James was

the only one left, Gerst again directed him to sit.  James once again explained that he was unable to sit, so Gerst went in search of security staff.  Crawford arrived and verified that he had given James permission to stand.  Gerst told James that he would not be seen until he sat, so James finally sat. After 20 seconds of painful sitting, Gerst called James into his office.  James explained the cause of his injury and the nature of his pain.  Gerst had James lie on the table and began raising his left leg.  Depsite James's protests of pain, Gerst continued to raise his leg until James felt a pop, and extreme pain shot through his leg.  Gerst then released his leg, but James was unable to bear his full weight on that leg.  He told Gerst that he was in more pain than when he arrived.  Gerst said he knew that, but James would live.  Gerst then gave James some pain medication and an exercise paper.

James saw Gerst again on May 26, 2009.  Gerst said there was nothing he could do for James and referred him to the doctor.  Gerst was not indifferent to James; he did all he could do, which was to refer James to a physician.  Applying the standards set forth above to these allegations, James has failed to state a claim against Gerst; therefore, Gerst is dismissed with prejudice from this action.

### *Nurse Peek*

Early on the morning of January 2, 2009, James was awakened by severe pain in his back and leg.  As he got up, a bolt of pain shot through his back, causing him to fall to the floor.  James's cellmate pressed the panic button to summon an officer, who then called a nurse.  Nurse Peek and another nurse arrived about 45 minutes later with a stretcher.  They rolled him onto his back causing him more pain.  Peek guessed that James suffered from sciatica and asked about his pain medication. James indicated the empty package, which Peek took.  She told him there was nothing more she could do for him at that time except have him stretch.  Peek told him she would have him called to see the P.A. in the morning, and then she left.  James alleges that he was not called to the medical

unit as promised nor did he receive more pain medication. This one encounter with Peek does not support a claim that she was deliberately indifferent to James's medical needs. James has failed to state a claim against Peek, so she is dismissed with prejudice from this action.

### *P.T. Verol*

James first saw Verol, a physical therapist, on February 28, 2009. After conducting several tests, Verol told James that he had a ruptured disk, most likely requiring surgery or injections. James told him of Obadina's diagnosis, and Verol said that sometimes doctors are wrong. Verol also said that he had doubts whether physical therapy would help, given the age of the injury. Verol advised James to practice proper body mechanics and to refrain from doing anything that hurt. Verol also said that he would see James again in four weeks, after which he would recommend an MRI. James asked for that recommendation to be made immediately, but Verol declined. Verol explained that if he didn't make a record that some treatment was tried, the doctor would not order the MRI.

James saw Verol again on April 1, 2009. Verol found that James's condition had worsened and referred him to a doctor. These two encounters with Verol do not support a claim that he was deliberately indifferent to James's medical needs. James has failed to state a claim against Verol, so he is dismissed with prejudice from this action.

### *Nurse Lane*

On March 25, 2009, James saw Lane on the nurse sick-call line. As soon as James entered the room, Lane directed him to sign the $2.00 co-payment voucher. James explained that he had a chronic condition, thus exempting him from the payment. Lane told him that he could either sign the voucher or leave without treatment, so James signed the voucher. He then told Lane about his

back and leg pain, and that his leg occasionally would go numb. Lane directed him to sit down, so James explained to her that Verol had told him not to sit because it caused him pain. Lane told him to do some exercises, but James refused, again referring to Verol's advice. Lane told him that she would make a call to verify his story and threatened him with segregation if he was lying. James asked if he could see the doctor, but Lane said it was unlikely based upon his behavior. James then asked permission to leave, which Lane granted. Lane did not ignore James; he is just unhappy with the advice and treatment he received. Applying the standards set forth above to these allegations, James has failed to state a claim against Lane; therefore, Lane is dismissed with prejudice from this action.

### *Nurse Melvin*

On April 28, 2009, James saw Melvin at the nurse sick-call line. James told her of his back and leg pain, stating that the pain medication did not help. Melvin advised him to continue the medication but did nothing else. This one encounter with Melvin does not support a claim that she was deliberately indifferent to James's medical needs. Because James has failed to state a claim against her, Melvin is dismissed with prejudice from this action.

### *Warden Schwartz and Michael Randle*

James states that he filed grievances covering all these matters; the grievances were denied in turn by Schwartz and Randle. James believes that any prison employee who knows (or should know) about his problems has a duty to fix those problems. This theory is in direct conflict with the well-established rule that "public employees are responsible for their own misdeeds but not for anyone else's." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see also Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir.

2001) (doctrine of respondeat superior does not apply to § 1983 actions).  The United States Court of Appeals for the Seventh Circuit recently held, as stated by Chief Judge Easterbrook:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.  The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.  [The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care.  That can't be right.  The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care. *See Durmer v. O'Carroll*, 991 F.2d 64 (3$^د$ Cir. 1993).

*Burks*, 555 F.3d at 595.

James has failed to state a claim against either Schwartz or Randle; consequently, they are dismissed with prejudice from this action.

### *Illinois Department of Corrections (I.D.O.C.)*

The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *accord Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001) (Eleventh Amendment bars suits against states in federal court for money damages); *Billman v. Indiana Dep't of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995) (state Department of Corrections is immune from suit by virtue of Eleventh Amendment); *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 427 (7th Cir. 1991) (same); *Santiago v. Lane*, 894 F.2d 218, 220 n.3 (7th Cir. 1990) (same).  Thus, the I.D.O.C. is dismissed with prejudice from this action.

**APPOINTMENT OF COUNSEL**

James also filed a motion for appointment of counsel (Doc. 3).  There is no absolute right to appointment of counsel in a civil case.  *Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir.  2010).  When presented with a request to appoint counsel, the Court must make the following inquiries: "(1) has the ... plaintiff made a reasonable attempt to obtain counsel or effectively been precluded from doing so and (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself."  *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc).  With regard to the first step of the inquiry, James asserts that he has made numerous attempts to retain counsel, and he submitted four letters from attorneys who declined to represent him in this matter.

With regard to the second step of the inquiry, "the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand."  *Id*.; *see also Santiago v. Walls*, 599 F.3d at 762-64.   At this point in time, it is difficult for the Court to assess this factor.  *See Romanelli v. Suliene*, _ F.3d _, No. 08-1762, 2010 WL 3155926 (7th Cir. Aug. 11, 2010) (noting infancy of case makes it impossible to make accurate determination of plaintiff's abilities to litigate case).  From a legal standpoint, the litigation of any constitutional claim falls in the range of complex.  Nevertheless, James's complaint adequately articulates his claim.  Defendants have not yet been served with process and, therefore, have not yet filed an answer to the complaint.  Future developments may change the Court's mind on whether counsel should be appointed.  At this early stage and time, though, the Court concludes that James appears to be competent to litigate his case.  Therefore, James's motion for appointment of counsel is **DENIED without prejudice**.

**S**UMMARY

**IT IS HEREBY ORDERED** that Defendants **FERRARI, ILLINOIS DEPARTMENT OF CORRECTIONS, LUCAS, MELVIN, PEEK, RANDLE, SCHWARTZ, VEROL, LANE,** and **GERST** are **DISMISSED with prejudice** from this action.  Plaintiff is advised that, within the Seventh Circuit, dismissal of these claims and defendants count as a strike for purposes of § 1915(g). *See George v. Smith,* 507 F.3d 605, 607-08 (7th Cir. 2007); *Boriboune v. Berge,* 391 F.3d 852, 855 (7th Cir. 2004).

The Clerk of Court is **DIRECTED** to prepare Form 1A (Notice of Lawsuit and Request for Waiver of Service of Summons) and Form 1B (Waiver of Service of Summons) for Defendant **OBADINA**.  The Clerk shall forward those forms, USM-285 forms submitted by Plaintiff, and sufficient copies of the complaint to the United States Marshal for service.

The United States Marshal is **DIRECTED**, pursuant to Rule 4(c)(2) of the Federal Rules of Civil Procedure, to serve process on Defendant **OBADINA** in the manner specified by Rule 4(d)(2) of the Federal Rules of Civil Procedure.  Process in this case shall consist of the complaint, applicable Forms 1A and 1B, and this Memorandum and Order.  For purposes of computing the passage of time under Rule 4(d)(2), the Court and all parties will compute time as of the date it is mailed by the Marshal, as noted on the USM-285 form.

With respect to former employees of Illinois Department of Corrections (I.D.O.C.) who no longer can be found at the work address provided by Plaintiff, the Department of Corrections shall furnish the Marshal with the Defendant's last-known address upon issuance of a Court order which states that the information shall be used only for purposes of effectuating service (or for proof of service, should a dispute arise) and any documentation of the address shall be retained only by the

Marshal. Address information obtained from I.D.O.C. pursuant to such order shall not be maintained in the Court file nor disclosed by the Marshal.

The United States Marshal shall file returned waivers of service as well as any requests for waivers of service that are returned as undelivered as soon as they are received. If a waiver of service is not returned by a defendant within **THIRTY (30) DAYS** from the date of mailing the request for waiver, the United States Marshal shall:

- Request that the Clerk of Court prepare a summons for that defendant who has not yet returned a waiver of service; the Clerk shall then prepare such summons as requested.

- Personally serve process and a copy of this Order upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure and 28 U.S.C. § 566(c).

- Within ten days after personal service is effected, the United States Marshal shall file the return of service for the defendant, along with evidence of any attempts to secure a waiver of service of process and of the costs subsequently incurred in effecting service on said defendant. Said costs shall be enumerated on the USM-285 form and shall include the costs incurred by the Marshal's office for photocopying additional copies of the summons and complaint and for preparing new USM-285 forms, if required. Costs of service will be taxed against the personally-served defendant in accordance with the provisions of Federal Rule of Civil Procedure 4(d)(2) unless the defendant shows good cause for such failure.

Plaintiff is **ORDERED** to serve upon Defendant or, if appearance has been entered by counsel, upon his attorney, a copy of every further pleading or other document submitted for consideration by this Court. He shall include with the original paper to be filed with the Clerk of the Court a certificate stating the date that a true and correct copy of any document was mailed to Defendant or his counsel. Any paper received by a district judge or magistrate judge which has not been filed with the Clerk or which fails to include a certificate of service will be disregarded by the Court.

Defendant is **ORDERED** to timely file an appropriate responsive pleading to the complaint,

and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule of the United States District Court for the Southern District of Illinois 72.1(a)(2), this cause is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings.

Further, this entire matter is hereby **REFERRED** to a United States Magistrate Judge for disposition, as contemplated by Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *should all the parties consent to such a referral.*

Plaintiff is **ADVISED** of his continuing obligation to keep the Clerk and each opposing party informed of any change in his whereabouts during the pendency of this action. This notification shall be done in writing and not later than seven (7) days after a transfer or other change in address occurs. Failure to provide such notice will result in dismissal of this action. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

DATED: 09/16/10

s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge